Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

[*additional counsel on signature page*]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY BERGMANN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GDS HOLDINGS LIMITED, WILLIAM WEI HUANG, and DANIEL NEWMAN,<br><br>Defendants. | No. 2:23-cv-4900-JAK (BFMx)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Lead Plaintiff KNA Family LLC, and named Plaintiff Larry Bergmann (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege in this amended complaint the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: review and analysis of Defendants' public statements, public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, and wire and press releases published by and regarding GDS Holdings Limited ("GDS" or the "Company"); media and analyst reports and advisories about the Company; interviews with confidential witnesses; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1. Plaintiffs bring this action as a federal securities class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class defined as all persons and entities that purchased the publicly traded American Depositary Shares ("ADS" or "ADSs") of GDS between July 13, 2020 and April 3, 2023, both dates inclusive ("Class Period").[1] Plaintiffs bring claims individually and on behalf

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

of the Class for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2. GDS develops and operates high-performance data centers in China and Southeast Asia. GDS maintains two classes of common stock: Class A and Class B. Class B shares are entitled to 20:1 voting rights on certain key corporate governance matters and they convert to Class A shares on a 1:1 basis.

3. Defendant William Wei Huang founded GDS and served as its CEO, and Chairman. During the Class Period, Huang's total beneficial ownership of GDS's stock was approximately 5.4-5.6%. Huang owned 100% of the Company's Class B shares.

4. Unbeknownst to GDS shareholders, between May 2020 and June 2022, Huang entered into variable prepaid forward contracts ("VPFCs") under which he received upfront cash payments in exchange for agreeing to sell over half his stock holdings between March and December 2023. Upon settling these transactions, Huang's beneficial ownership interest stood to decrease below 5%, which would trigger a series of significant adverse events.

5. If Huang's ownership fell below the 5% threshold, it would trigger an automatic conversion event – whereby all Class B shares would automatically convert into Class A shares, and the Company's dual-class share structure would be terminated. This would constitute a change of control for the purposes of the Company's domestic loan facility agreements, which could give the Company's lenders the right to demand early repayment and/or terminate the agreements. The change of control also carried potential implications in the context of China's national security review regime and anti-monopoly merger filing requirements.

6. Throughout the Class Period, Defendants made false and misleading statements and omissions of material fact by failing to disclose Huang's secret agreements to divest over half of his holdings, and the concomitant risks

engendered by those agreements, including by falsely and repeatedly stating that "We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company."

7. Investors finally learned about Huang's undisclosed dealings in April 2023, when the Company first disclosed the existence of these VPFCs and the associated risks that the Company had been facing all along. The Company admitted that Huang's VPFC's—whose expiration dates were now imminent—created material risks connected to triggering the change of control provisions and "may have a material and adverse effect on our business development, financial condition and future prospects."

8. On this news, the price of the Company's ADS fell by $1.30 per share, or approximately 7%, over the next two trading days, damaging investors.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the alleged false and misleading statements entered, and the subsequent damages took place in, this judicial district.

13. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet, and the facilities of the national securities exchange.

## PARTIES

14. Lead Plaintiff KNA Family LLC, as set forth in its certification on file with the Court (Dkt. No. 27-2) and incorporated by reference herein, purchased the Company's ADS at artificially inflated prices during the Class Period and was damaged thereby.

15. Named Plaintiff Larry Bergmann, as set forth in his certification on file with the Court (Dkt. No. 1-1) and incorporated by reference herein, purchased the Company's ADS at artificially inflated prices during the Class Period and was damaged thereby.

16. Defendant GDS is incorporated in the Cayman Islands. Its principal place of business is located at F4/F4, Building C, Sunland International No. 999 Zhouhai Road, Pudong, Shanghai 200137, People's Republic of China ("China"). GDS's ADS trade on the NASDAQ Global Market exchange under the ticker symbol "GDS." Each of the Company's ADS represent eight of the Company's Class A ordinary shares, which trades on the Stock Exchange of Hong Kong Limited.

17. GDS maintains two classes of ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share on any resolution tabled at the Company's general meeting. Holders of Class B ordinary shares are entitled to 20 votes per share on resolutions tabled at the Company's general meeting for (i) the election or removal of a simple majority (six) of the Company's directors; and (ii) any change to the Company's Articles of Association that would adversely affect

the rights of Class B shareholders. Each Class B ordinary share is convertible into one Class A ordinary share. Class B ordinary shares automatically convert into Class A ordinary shares under certain circumstances, as detailed below.

18. Defendant William Wei Huang ("Huang") is the Company's founder, CEO, and Chairman of the Board of Directors. Huang founded the Company in 2001 and has served as its CEO since 2002. Huang serves on the Compensation Committee, Nominating and Corporate Governance Committee, and Executive Committee of the Company's Board of Directors.

19. Defendant Daniel Newman ("Newman") has served as the Company's CFO since 2011, after serving as an advisor to GDS from 2009 to 2011.

20. Huang is described as a "Controlling Shareholder" of GDS in the Company's SEC filings, as that term is defined in the Hong Kong exchange's Listing Rules. At all relevant times, Huang held 100% of the Company's Class B ordinary shares.

21. Defendants Huang and Newman are collectively referred to herein as the "Individual Defendants."

22. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(g) approved or ratified the false and misleading statements alleged herein in violation of the federal securities laws.

23. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24. The scienter of the Individual Defendants and other employees and agents is similarly imputed to GDS under *respondeat superior* and agency principles.

25. GDS and the Individual Defendants are collectively referred to herein as "Defendants."

## **ALLEGATIONS OF SECURITIES FRAUD**

### **Company Background**

26. GDS develops and operates high-performance data centers in China. The Company's data centers are designed with large net floor area and power capacity, high power density and efficiency, and multiple redundancy across all critical systems. In China, GDS purports to be carrier and cloud neutral, allowing its customers to access all the major Chinese telecommunications networks and the largest Chinese and global public clouds, which the Company hosts in many of its facilities.

27. GDS offers colocation and managed cloud-based services. At the end of 2022, the Company had an aggregate net floor area of 515,787 square meters in service, 95.5% of which was committed by customers, and an aggregate net floor area of 192,713 square meters under construction, 71.5% of which was pre-committed by customers. The Company's operational results are largely

determined by utilization and degree of commitment or pre-commitment of its data centers' capacity.

28. The Company generates revenue primarily from colocation services and, to a lesser extent, managed services, including managed hosting and managed cloud services.

29. The Company's colocation services primarily comprise the provision of space, power, and cooling to customers for housing servers and related information technology ("IT") equipment. Customers can place their networking, server, and storage equipment in a shared or private space that can be customized to their requirements, including customized power options for a customer's particular power requirements.

30. The Company's managed services include managed hosting and managed cloud services. Its managed hosting services include technical services, network management services, data storage services, system security services, database services and server middleware services. Its managed cloud services include direct private connection to leading public clouds and a service platform for managing hybrid cloud systems.

31. The Company has explained that its "returns depend on our ability to develop data centers at commercially acceptable terms. We have historically funded data center development through additional equity or debt financing. We expect to continue to fund future developments through debt financing or through the issuance of additional equity securities…."

32. For 2020, 2021, and 2022, the Company reported annual interest expenses of approximately $191 million (22.9% of that year's total revenues), $240 million (21.1%), and $274 million (20.3%), respectively.[2]

---

[2] Some figures, where not provided in U.S. dollars, have been converted from Renminbi (RMB), the Chinese currency, at the rate of RMB6.8972 per $1.00, the

33. At the end of 2020, GDS reported that it held total long-term debt of $3.2 billion, along with short-term debt of $369 million. By the end of 2022 those reported figures had ballooned to $5.3 billion and $893 million.

34. At year end in 2020, 2021, and 2022, GDS had short-term borrowings of $189 million with a weighted average interest rate of 4.67%, $673 million at 4.91%, and $240 million at 7.94%, respectively. At those same times, GDS had long-term borrowings of $1.8 billion with a weighted average interest rate of 6.73%, $2.8 billion at 5.53%, and $3.7 billion at 5.44%, respectively.

35. Indeed, by the end of 2022, the Company reported total payments due on short-term borrowing as $202 million, and payments due on long-term borrowing as $3.7 billion.

36. On February 8, 2021, Huang filed a Schedule 13G/A with the SEC reporting his beneficial ownership of 80,446,240 shares, approximately 5.4%, of the Company's Class A common stock as of December 31, 2020.

37. On April 12, 2021, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2020 ("2020 20-F"), which Huang signed. The 2020 20-F reported that as of March 31, 2021, Huang beneficially owned 83,326,240 shares, or approximately 5.4% of the Company's Class A common stock.

38. On January 25, 2022, Huang filed a Schedule 13G/A with the SEC reporting his beneficial ownership of 83,859,040 shares, approximately 5.6%, of the Company's Class A common stock as of December 31, 2021.

39. On April 28, 2022, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2021 ("2021 20-F"), which Huang

---

conversion rate used in the Company's 2022 annual report, representing the exchange rate set forth in the H.10 statistical release of the Federal Reserve Board on December 30, 2022.

signed. The 2021 20-F reported that as of April 15, 2022, Huang beneficially owned 86,739,040 shares, or approximately 5.6% of the Company's Class A common stock.

40. On February 10, 2023, Huang filed a Schedule 13G/A with the SEC reporting his beneficial ownership of 86,047,840 shares, approximately 5.6%, of the Company's Class A common stock as of December 31, 2022.

41. Upon information and belief, Huang's beneficial ownership never increased substantially above 5.6% of the Company's Class A common stock during the Class Period, such that at all points during the Class Period his sale of approximately 42 million shares would leave Huang with substantially less than the 5% ownership threshold.

**Variable Prepaid Forward Contracts**

42. A variable prepaid forward contract ("VPFC") allows someone, typically a company executive seeking to extract cash from their large share holdings, to sell shares, often to a stock brokerage company, for future delivery at an agreed discount for cash today. Stock ownership only transfers at the end of the contract term, and the amount of stock or cash transferred to settle the transaction at the future date depends on the share price at that date. This strategy allows the selling shareholder to defer the taxes owed on the capital gains from the sale until the settlement date. It also allows the selling shareholder to maintain other ownership rights in the stock until the contract expiry date, such as voting and dividend rights.

43. The seller typically receives 75-90% of the current value of the subject stock shares at the time of the sale, a present-value discount, in exchange for a variable number of shares in the future. The seller receives the cash upfront but does not transfer the shares, or pay capital gains taxes on the shares, until the

contract expiration date when the amount of shares is calculated. At that time, the stockholder turns over the shares or the cash equivalent.

44. The contract establishes a floor and ceiling share price on the final transaction, so it protects the investor from a heavy loss if the stock price declines dramatically in value before the contract expires. If at expiry the shares are trading below the floor, the seller transfers the number of shares as stated in the original sale. If the shares are trading between the floor and cap prices, the number of shares delivered will be the amount of the collateralized loan (the prepayment amount) divided by the actual share price. If the share price at expiry is above the cap, the seller will repay the principal plus additional value (the difference between the cap and the actual share price multiplied by the number of shares sold).

45. A VPFC is essentially a collar strategy: a bundled long put option and short call option on a security, combined with a loan against the underlying security. In many respects, a VPFC resembles a collateralized loan, with nominal interest coming in the form of the discounted sale price.

46. By way of illustration, an investor enters a VPFC to sell their shares. The shares are trading at $9.50 each, and the investor sells 100,000 shares in a VPFC at $8 per share, with a maturity of three years. The floor and cap prices are set at $8 and $10, respectively. The total sale or the principle would amount to $800,000, which the seller would receive when the VPFC is executed (a discount to the current $950,000 value of the shares).

47. At the end of the third year, if the share price is $6, the investor will deliver all 100,000 shares (worth $600,000), but no more. The investor is thus insulated from major downside risk if the share price collapses.

48. If the shares are trading between $8-10 per share, the shares due are calculated by dividing the principal ($800,000) by the current share price (*i.e.*, if the price per share is $8, the investor delivers 100,000 shares, if the price per share

is $9.00, the investor will deliver 88,889 shares, and if the price per share is $10, the investor will deliver 80,000 shares).

49. If the shares are trading at $12 per share, the investor will deliver the principal ($800,000) plus the excess over the cap price, in this case $1,000,000 ($800,000 + 100,000 * ($12 – $10)). Alternatively, the investor can deliver 83,333 shares ($1,000,000 / 12). The investor captures only limited upside from the increased share price, in addition to the tax benefits of deferring any capital gains taxes until the contract expires.

50. Although the selling shareholder typically has the option to settle the transaction using cash or stock, shareholders who enter a VPFC in order to create increased liquidity from their stock holdings will typically settle the transactions using stock, rather than cash.

51. According to a study reviewing firm performance in connection with insiders' VPFCs, VPFCs allow insiders to hedge downside risk, are substantially larger than a typical open-market sale, and systematically precede degraded stock and earnings performance. According to the same study, VPFCs also precede periods of relatively negative abnormal returns, and the evidence suggests that insiders use VPFCs to diversify their company holdings in anticipation of performance declines.[3]

52. Thus, even without the significant GDS-specific consequences of Huang's undisclosed VPFCs at issue, such as triggering the change of control provisions, there was a substantial likelihood that disclosure of Huang's VPFCs would have been viewed by a reasonable investor as having significantly altered the total mix of information made available about GDS.

---

[3] Alan D. Jagolizer, et al. "An Analysis of Insiders' Use of Prepaid Variable Forward Transactions." *Journal of Accounting Research*, vol. 45, no. 5, 2007, pp. 1055–79.

53. Under Item 403(b) of SEC Regulation S-K, executive officers are required to disclose in annual reports the amount of company securities they beneficially own *and have pledged as collateral*, including in "hedging transactions" such as VPFCs. 17 CFR § 229.403(b).

54. Item 6 of SEC Schedule 13D requires the disclosure of "any contracts, arrangements, understandings or relationships (legal or otherwise) … with respect to any securities of the issuer," and filers must include such information for any of the securities that are pledged or otherwise subject to a contingency the occurrence of which would give another person voting power or investment power over such securities." 17 CFR § 240.13d-101.

55. While Regulation S-K does not apply directly to GDS and Huang filed Schedule 13Gs instead of Schedule 13D, the fact that these provisions which govern disclosure responsibilities for other (domestic) public companies and major stockholders of public companies show the importance to investors of the full disclosure of securities pledged as collateral under VPFCs and similar agreements.

**Defendants Made Materially False and Misleading Statements and Omissions of Material Facts During the Class Period**

56. On July 13, 2020, the Company filed with the SEC a prospectus supplement and prospectus ("July 2020 Prospectus Supplement"). The July 2020 Prospectus Supplement was part of a registration statement filed with the SEC on January 23, 2018, which Defendants Huang and Newman each signed.

57. The July 2020 Prospectus Supplement stated that:

> All Class B ordinary shares are subject to automatic conversion into Class A ordinary shares on the same business day as the first to occur of the following: (i) Mr. William Wei Huang, our founder, chairman and chief executive officer, collectively ceasing to have beneficial ownership (as such term is interpreted pursuant to applicable U.S. securities laws and rules, regulations and forms promulgated thereunder by the SEC), in aggregate,

> of not less than five per cent (5%) of our issued and outstanding share capital on an as-converted basis….

58. This statement was misleading because Defendants failed to disclose that: (1) Huang had engaged in undisclosed pre-paid forward sale contract transactions as early as May 2020; (2) this presented a material risk of Huang's ownership falling below 5% of the Company's outstanding shares; (3) if Huang's ownership fell below 5%, it would result in an automatic conversion event triggering a change of control of the Company, which could have major consequences for the Company's financial condition.

59. On October 27, 2020, the Company filed with the SEC a prospectus supplement ("October 2020 Prospectus Supplement"). The October 2020 Prospectus Supplement was part of a registration statement filed with the SEC on January 23, 2018, which Defendants Huang and Newman each signed.

60. The October 2020 Prospectus Supplement stated that:

> All Class B ordinary shares are subject to automatic conversion into Class A ordinary shares on the same business day as the first to occur of the following: (i) Mr. William Wei Huang, our founder, chairman and chief executive officer, collectively ceasing to have beneficial ownership (as such term is interpreted pursuant to applicable U.S. securities laws and rules, regulations and forms promulgated thereunder by the SEC), in aggregate, of not less than five per cent (5%) of our issued and outstanding share capital on an as-converted basis….

61. This statement was misleading because Defendants failed to disclose that: (1) Huang had engaged in undisclosed pre-paid forward sale contract transactions as early as May 2020; (2) this presented a material risk of Huang's ownership falling below 5% of the Company's outstanding shares; (3) if Huang's ownership fell below 5%, it would result in an automatic conversion event

triggering a change of control of the Company, which could have major consequences for the Company's financial condition.

62. On February 3, 2021, the Company filed with the SEC a registration statement ("February 2021 Registration Statement") on Form F-3. Defendants Huang and Newman each signed the February 2021 Registration Statement.

63. The February 2021 Registration Statement stated that:

> All Class B ordinary shares are subject to automatic conversion into Class A ordinary shares on the same business day as the first to occur of the following: (i) Mr. William Wei Huang, our founder, chairman and chief executive officer, collectively ceasing to have beneficial ownership (as such term is interpreted pursuant to applicable U.S. securities laws and rules, regulations and forms promulgated thereunder by the SEC), in aggregate, of not less than five per cent (5%) of our issued and outstanding share capital on an as-converted basis….

64. This statement was misleading because Defendants failed to disclose that: (1) Huang had engaged in undisclosed pre-paid forward sale contract transactions as early as May 2020; (2) this presented a material risk of Huang's ownership falling below 5% of the Company's outstanding shares; (3) if Huang's ownership fell below 5%, it would result in an automatic conversion event triggering a change of control of the Company, which could have major consequences for the Company's financial condition.

65. The 2020 20-F contained the following statement:

> Subject to the provisions of our Articles of Association, our Class B ordinary shares may be converted into Class A ordinary shares at the option of the holder or automatically at the occurrence of an automatic conversion event. Such automatic conversion event refers to the first occurrence of (i) Mr. Huang having beneficial ownership in less than 5% of our issued share capital on an as converted basis…

66. This statement was misleading because Defendants failed to disclose that: (1) Huang had engaged in undisclosed pre-paid forward sale contract transactions as early as May 2020; (2) this presented a material risk of Huang's ownership falling below 5% of the Company's outstanding shares; (3) if Huang's ownership fell below 5%, it would result in an automatic conversion event triggering a change of control of the Company, which could have major consequences for the Company's financial condition. By the time the 2020 20-F was filed with the SEC, Huang had entered into variable pre-paid forward sale contracts which could drive his beneficial ownership interest in the Company's total issued share capital below 5%.

67. The 2020 20-F also stated that "We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company."

68. This statement was false because Defendants knew, or were severely reckless in not knowing, but failed to disclose that: (1) Huang had engaged in undisclosed pre-paid forward sale contract transactions as early as May 2020; (2) this presented a material risk of Huang's ownership falling below 5% of the Company's outstanding shares; (3) if Huang's ownership fell below 5%, it would result in a change of control of the Company, which could have major consequences for the Company's financial condition. By the time the 2020 20-F was filed with the SEC, Huang had entered into variable pre-paid forward sale contracts which could, at a later date, result in a change of control of the Company.

69. Attached to the 2020 20-F were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Huang and Newman, attesting to the accuracy of financial reporting, and the disclosure of all fraud.

70. Specifically, the SOX certifications stated that the 2020 20-F: (1) "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading"; and (2) that the information contained in the report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

71. These statements were false because the 2020 20-F did contain omissions of material fact that rendered certain of its statements misleading, as identified above, and accordingly the information in the report did not fairly present, in all material respects, the financial condition of the Company.

72. The 2021 20-F contained the following statement:

> Subject to the provisions of our Articles of Association, our Class B ordinary shares may be converted into Class A ordinary shares at the option of the holder or automatically at the occurrence of an automatic conversion event. Such automatic conversion event refers to the first occurrence of (i) Mr. Huang having beneficial ownership in less than 5% of our issued share capital on an as converted basis…

73. This statement was misleading because Defendants failed to disclose that: (1) Huang had engaged in undisclosed pre-paid forward sale contract transactions as early as May 2020; (2) this presented a material risk of Huang's ownership falling below 5% of the Company's outstanding shares; (3) if Huang's ownership fell below 5%, it would result in an automatic conversion event triggering a change of control of the Company, which could have major consequences for the Company's financial condition. By the time the 2021 20-F was filed with the SEC, Huang had entered into variable pre-paid forward sale contract transactions which could drive his beneficial ownership interest in the Company's total issued share capital below 5%.

74. The 2020 20-F also stated that "We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company."

75. This statement was false because Defendants knew, or were severely reckless in not knowing, but failed to disclose that: (1) Huang had engaged in undisclosed pre-paid forward sale contract transactions as early as May 2020; (2) this presented a material risk of Huang's ownership falling below 5% of the Company's outstanding shares; (3) if Huang's ownership fell below 5%, it would result in a change of control of the Company, which could have major consequences for the Company's financial condition. By the time the 2021 20-F was filed with the SEC, Huang had entered into variable pre-paid forward sale contracts which could, at a later date, result in a change of control of the Company.

76. Attached to the 2021 20-F were SOX certifications signed by Huang and Newman, attesting to the accuracy of financial reporting, and the disclosure of all fraud.

77. Specifically, the SOX certifications stated that the 2021 20-F: (1) "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; and (2) that the information contained in the report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

78. These statements were false because the 2021 20-F did contain omissions of material fact that rendered certain of its statements misleading, as identified above, and accordingly the information in the report did not fairly present, in all material respects, the financial condition of the Company.

**Defendants Reveal Huang's VPFCs and the Undisclosed Associated Risks, Causing the Company's Share Price to Fall**

79. On April 4, 2023, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2022 ("2022 20-F").

80. In the 2022 20-F, the Company admitted that Defendant Huang had entered into undisclosed VPFC transactions, which the Company had previously

omitted from its filings, and which could spell disastrous consequences for the Company if Defendant Huang's share ownership went below 5%. The 2022 20-F revealed that Huang's current holdings amounted to roughly 5.39% of the Company's issued share capital, and that he had entered into VPFCs that stood to reduce his holdings *by more than half* – which would take his ownership percentage far below the 5% threshold.

81. The 2022 20-F stated, in pertinent part:

> ***If Mr. Huang's beneficial ownership in our company falls below 5%, our dual-class share structure will terminate and a change of control would be triggered under certain of our material commercial and loan agreements, and our business development, financial condition and future prospects may be materially and adversely affected.***
>
> Subject to the provisions of our Articles of Association, our Class B ordinary shares will automatically convert into Class A ordinary shares upon the occurrence of an automatic conversion event, which events include, among others, Mr. Huang having beneficial ownership in less than 5% of our issued share capital on an as converted basis. As of March 15, 2023, Mr. Huang beneficially owned (whether in the form of ordinary shares or ADSs) 84,047,840 ordinary shares, representing 5.39% of our total issued share capital.
>
> Mr. Huang has in the past entered into, and may in the future enter into, certain transactions from time to time, including derivative transactions, that have and could have the effect of reducing Mr. Huang's beneficial ownership in our company. ***Mr. Huang informed our company that certain variable pre-paid forward sale contract transactions in respect of 42,457,504 ordinary shares beneficially owned by him, which transactions he originally entered into between May 2020 and June 2022, would expire between March 2023 and December 2023. If Mr. Huang chooses to settle these transactions***

> ***by transferring ownership of the 42,457,504 ordinary shares to the counterparties, his beneficial ownership interest in our total issued share capital may decrease to below 5%, which would trigger an automatic conversion event, unless the 5% threshold contained in our Articles of Association is reduced or he otherwise acquires beneficial ownership of additional shares to keep his beneficial ownership at or above 5% or such other threshold if so reduced***.
>
> Should this happen, all Class B ordinary shares would automatically convert into Class A ordinary shares, and the dual-class share structure would thereby be terminated. ***This would constitute a change of control for the purposes of certain of our, or our subsidiaries' and the consolidated entities', sales agreements and domestic loan facility agreements, and if such provisions under the domestic loan agreements are triggered, which could give the lenders the right to demand early repayment under these domestic loan agreements***. ***Such change of control may result in actual, potential or alleged breaches or early termination of other contracts or agreements***. ***The change of control potentially may also have implications for the purposes of China's national security review regime and anti-monopoly merger filing requirements, if applicable***. ***The occurrence of any of the foregoing may have a material and adverse effect on our business development, financial condition and future prospects.***
>
> (Emphasis added).

82. On this news, the price of GDS ADS fell by $0.74 per ADS, or 4.0%, to close at $17.80 on April 4, 2023. The next day it declined an additional $0.56 per ADS, or 3.1%, to close at $17.24. In total, the price of GDS ADS fell by $1.30 per share, or 7.0%, by the end of the day following the new disclosure concerning Huang's VPFC's.

83. This price decline was due, at least in part, because the disclosure of new information revealed the full scope of the materialized risks concealed by Defendants' omissions of the facts that Huang had secretly entered into VPFCs that threatened to reduce his holdings of the Company's Class A shares below the critical "change of control" threshold.

84. The significance of these revelations to the market was demonstrated during the Company's First Quarter 2023 Earnings Conference Call. During that call, Huang responded to "a number of concerns" from the Company's investors concerning the news that Huang had entered into VPFCs that threatened to drastically reduce his ownership by more than half, and well below critical "change of control" threshold that would carry significant adverse effects for the Company.

85. In the wake of the revelations about his stock sale agreements, Huang apparently felt it was necessary to reassure investors that "[f]or me, leading GDS is about much more than just a financial gains," and that his "dedication remains unwavering, and I assure you that nothing has changed in this regard." Huang's assurances indicate that investors had serious concerns about not only the potential impact of Huang's sales triggering the "change of control" provisions, but also about Huang's dedication to, and confidence in, the Company's continuing success.

86. Indeed, during the same earnings call, an analyst from Deutsche Bank pressed the Company's executives further on the issue of Huang's VPFCs, noting that "I hadn't heard of [the sales] before."

87. In response, Daniel Newman, the Company's CFO, stated that the counterparty banks disclosed the transactions, but only in paper filings. Newman acknowledged that while "some institutional investors, I think, subscribe to services who search paper filings and access that information…, many do not. As a result, ***I think quite a few institutional investors … were not aware of the***

***disclosure***." Newman also noted that in April 2023, "the SEC changed their system. So those disclosures would have been made electronically now and it would have been accessible in the usual way."

88. As the Deutsche Bank analyst pointed out, "I'm sure the people who invested in the secondary listing would have liked to have known that." He also noted that "[y]ou've had a few years where you've been aware of this." Newman did not dispute that Defendants had known about Huang's VPFCs for multiple years.

89. Upon information and belief, Newman was referencing the SEC's amendment to Rule 101 of Regulation S-T to require, as of April 2023, the electronic filing of Forms 144 on EDGAR – the SEC's free, publicly accessible online repository of public company filings – rather than allowing such forms to be filed on paper.

90. According to a letter supporting the SEC's amendment by professors from the Graduate School of Business at Stanford University and The Wharton School and the University of Pennsylvania, under the prior rule allowing paper filing, 99.3% of Form 144s were filed on paper between 2001 and 2020.[4] The SEC retained hard copies of those paper filings for 90 days in its Public Reading Room in Washington, DC and did not post them on EDGAR. Without physically visiting the SEC's Public Reading Room to view filings not yet destroyed, investors gain learn information regarding these Forms 144 only by contracting with expensive and exclusive third-party data providers. Paper filing of Forms 144 essentially rendered this information "inaccessible to individual investors" without the resources to pay for this information, and "shielded from public scrutiny."

---

[4] *See* Letter dated Mar. 10, 2021, from David Larcker, *et al.*. *Available at* https://www.sec.gov/comments/s7-24-20/s72420-8488827-229970.pdf

91. Accordingly to the extent any information regarding Huang's VPFCs were included in Forms 144 filed on paper, it was not well-known to the market, including to major institutional investors and analysts such as Deutsche Bank. Investors were under no obligation to visit the SEC's offices in Washington, DC to review Form 144 paper filings they had no reason to know existed or were of any material import. Moreover, Defendants' false and misleading statements and omissions concerning Huang's VPFCs—which even expressly denied the existence of any such agreements—deceived investors and would not have alerted investors as to the need for any such independent sleuthing.

92. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADS, Plaintiffs and other Class members have suffered significant losses and damages.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

93. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and the Class.

94. Throughout the Class Period, shares of the Company's ADS were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of shares of the Company's ADS were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by GDS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

97. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants violated the federal securities laws as alleged herein;
- whether, during the Class Period, Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing, or causing the Company to issue, false and misleading SEC filings and public statements during the Class Period;
- whether the price of the Company's ADS was artificially inflated during the Class Period because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

98. Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive

proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

99. Alternatively, Plaintiffs will rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) during the Class Period, Defendants made public statements of material fact that were rendered misleading because of Defendants' failure to disclose material facts necessary to prevent such statement from being misleading; (b) as a result of the misleading statements and omissions of material fact, the Company's ADS traded at artificially inflated prices during the Class Period; (c) Plaintiffs and other members of the Class purchased or otherwise acquired the Company's ADS relying on the integrity of the market price of the Company's ADS and market information relating to the Company, and have been damaged thereby.

100. During the Class Period, the artificial inflation of the Company's ADS was caused by Defendants' misleading statements and omissions of material fact as described above, causing the damages sustained by Plaintiffs and the other members of the Class. Defendants' misleading statements and omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, causing the price of the Company's ADS to be artificially inflated at all relevant times, including when Plaintiffs and other members of the Class purchased shares. When the truth hidden by these misleading omissions was disclosed, that disclosure negatively affected the value of the Company's ADS, dissipating the artificial inflation and damaging Plaintiffs and other members of the Class.

101. The market for the Company's ADS was an efficient market at all times during the Class Period for the following reasons, among others:

(a) Defendants made public misleading statements and failed to disclose material facts during the Class Period;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of current reports in their SEC filings;

(d) The Company's ADS were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 7.1 million shares of the Company's ADS, or roughly 4.0% of its total ADS outstanding (based on the 1:8 ratio of ADS to outstanding Class A ordinary shares), were traded weekly during the Class Period, permitting a very strong presumption that the Company's ADS traded on an efficient market;

(e) During the Class Period, the Company's ADS met the requirements for listing, and were listed and traded on the NASDAQ, a highly efficient and automated market;

(f) The Company was covered by multiple securities analysts employed by brokerage firms who wrote reports about the Company, which were distributed to customers, made publicly available, and entered the public marketplace;

(g) The misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

102. Based on the foregoing, the market for the Company's ADS promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the Company's ADS. Under these circumstances, all purchasers of the Company's ADS during the Class Period suffered similar injury through their purchase of the Company's ADS at artificially inflated prices, and thus are entitled to a presumption of reliance.

103. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

104. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

**(Against All Defendants)**

105. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

106. This Count is asserted against Defendants, Huang, and Newman and is based on Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

107. During the Class Period, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they, individually and in concert, directly or indirectly, disseminated or approved the misleading statements specified above, which they knew or recklessly disregarded were misleading in that they failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108. Defendants acted with scienter in that they knew or recklessly disregarded that the public statements issued or disseminated in the name of the Company were materially misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

109. Defendants Huang and Newman, the CEO and CFO of the Company, respectively, had actual knowledge of the material facts omitted from the statements as set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements to members of the investing public, including Plaintiffs and the Class.

110. As a result of the foregoing, the market price of the Company's ADS was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADS during the Class Period in purchasing the Company's ADS at prices that were artificially inflated as a result of Defendants' misleading statements.

111. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's ADS had been artificially inflated by Defendants'

misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's ADS at the artificially inflated prices that they did, or at all.

112. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

113. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's ADS during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

114. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115. During the Class Period, Defendants Huang and Newman participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. As the Company's CEO and CFO, they knew the material information omitted from the Company's misleading statements.

116. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

117. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Defendants Huang and Newman, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's ADS.

118. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B. Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class prejudgment and post-judgment interest and their reasonable costs and expenses incurred in prosecuting this action, including reasonable attorneys' fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 18, 2023

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jbaker@rosenlegal.com

Phillip Kim (*pro hac vice* forthcoming)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Lead Counsel for Plaintiffs*

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (877) 590-0483
Email: brian@schallfirm.com

*Additional Counsel for Plaintiffs*